United States Court of Appeals
FOR THE EIGHTH CIRCUIT

_____

No. 96-3995SI

_____

Charles Gunn,                               *
                                            *
        Appellant,                          *
                                            *
    v.                                      *   On Appeal from the United
                                            *   States District Court for
                                            *   the Southern District of
United States Department of Agriculture     *   Iowa.
and Natural Resources Conservation          *
Service,                                    *
                                            *
        Appellees.                          *

_____

Submitted: May 19, 1997

Filed:  July 7, 1997

_____

Before RICHARD S. ARNOLD, Chief Judge, BOWMAN and MORRIS SHEPPARD
    ARNOLD, Circuit Judges.

_____

RICHARD S. ARNOLD, Chief Judge.

Charles Gunn filed this action in the District Court[1] to challenge the Soil Conservation Service's (SCS's[2]) determination that certain parts of his farmland were converted wetlands and could therefore not be farmed without his losing eligibility for certain farm benefit programs. The District Court held that the SCS's regulations are a reasonable interpretation of the pertinent statute, 16 U.S.C. §§ 3801, 3821-24, and that the SCS's determination that the lands were wetlands was supported by substantial evidence. The Court dismissed Gunn's taking-by-inverse-condemnation claim for lack of jurisdiction. We affirm.

I.

Gunn owns 160 acres of land in Iowa that he and his predecessors-in-interest have farmed since 1906. Before that time the acreage was wetlands and not arable. In 1906 the local drainage district installed tiles under the land to drain the excess water from the land. Other tiling allowed water from neighboring farmland to drain across Gunn's land. By 1947, additions to the drainage system had increased the drained area so that the amount of water in some years exceeded the capacity of the system, leaving parts of Gunn's land wet and unsuitable for farming. Realizing that a drainage problem existed, the drainage district in 1992 installed new drainage tiles and dug an open ditch on Gunn's land that remedied the system's shortcomings.

In order to combat the disappearance of wetlands through their conversion into crop lands, Congress passed a law known commonly as "Swampbuster." Food

---

[1]The Hon. Charles R. Wolle, Chief Judge, United States District Court for the Southern District of Iowa.

[2]The SCS, an agency within the Department of Agriculture, was abolished in 1994, and its functions were transferred to the Natural Resources Conservation Service. See Pub. L. No. 103-354, § 246, 108 Stat. 3178, 3223-25 (1994) (codified at 7 U.S.C. § 6962). For ease of reference, we use the term SCS throughout the opinion.

Security Act of 1985, Pub. L. No. 99-198, §§ 1201, 1221-23, 99 Stat. 1354, 1504-08 (codified as amended at 16 U.S.C. §§ 3801, 3821-24). This law did not make illegal the conversion of wetlands to agricultural use, but did provide that any agricultural production on a converted wetland would cause the farmer to forfeit his eligibility for a number of federal farm-assistance programs. Among the exemptions to the provisions of Swampbuster is one for wetlands that had been converted to agricultural production before December 23, 1985. See § 3821(d). The farming of such previously converted wetlands does not make the farmer ineligible for benefits.

In order for a farmer to participate in the benefits programs, he must certify his eligibility to the SCS. The SCS determines whether the land for which a farmer seeks benefits contains wetlands that have been converted for agricultural purposes. Charles Gunn sought certification in 1991, and was told by the SCS that his farm contained 32.9 acres of "farmed wetlands," which are, in essence, wetlands that are sometimes dry enough to farm. The SCS advised Gunn that he could continue to farm these lands as well as maintain the existing drainage system, but if he wished to remain eligible for benefits he could not improve the land's drainage. This ruling was upheld after an appeal within the agency. Gunn did not seek further review.

In 1992, the local drainage district improved the drainage system, as noted above. In the process of analyzing the new system, SCS discovered that the previous drainage system had had a greater capacity than previously realized, but still had been insufficient to drain the land completely. It also determined that because the new system completely drained the land, part of Gunn's land now constituted converted wetlands. After a series of appeals within the agency, the SCS concluded that 28.2 acres of Gunn's land were wetlands that had been converted by the drainage district's recent activities and could not be farmed by Gunn without his losing eligibility for farm benefit programs.

Gunn then filed this action in the District Court, seeking a declaratory judgment that he was entitled to farm this land without losing benefits, and damages for his not having farmed the lands during the decision and appeal process. In the alternative, if the converted-wetlands determination was upheld, he sought compensation for a taking of land by inverse condemnation. The District Court held that the classification of the lands as converted wetlands was reasonable, denied Gunn's desired declaration, and refused to award damages. It also dismissed the takings claim for lack of jurisdiction because Gunn sought compensation in an amount greater than $10,000, a claim over which the Court of Federal Claims has exclusive jurisdiction. See 28 U.S.C. §§ 1346, 1491. The District Court also stated that the government's action was not a taking. Gunn then took this appeal.

## II.

Gunn challenges the SCS's decision in two ways. First, he contends that the pertinent regulations are neither consistent with, nor a reasonable interpretation of, the Swampbuster statute. Second, he argues that the SCS failed to follow its own regulations in deciding his eligibility. We hold that the regulations are consistent with the statute and that the SCS followed those regulations in its decision-making process.

## A.

The statute makes ineligible for benefits, listed at 16 U.S.C. § 3821(b), any person who "converts a wetland by draining, dredging, filling, leveling, or any other means for the purpose, or to have the effect, of making the production of an agricultural commodity possible on such converted wetland . . . for that crop year and all subsequent crop years." § 3821(c). It also makes ineligible for these same benefits, such as crop insurance, price supports, and government-sponsored loans, any person who "produces an agricultural commodity on converted wetland." § 3821(a). The act defines a converted wetland as a "wetland that has been drained, dredged, filled,

-4-

leveled or otherwise manipulated" so that agricultural production is made possible. § 3801(a)(6)(A). The statute provides one exception relevant to this case: no person becomes ineligible for agricultural production on converted wetlands "if the conversion of the wetland was commenced before December 23, 1985." § 3822(b)(1)(A).

The SCS has promulgated regulations to refine the scope of these provisions. Gunn contends the regulations are contrary to the plain language of the statute, and, if the statute is ambiguous, that the regulations are not a reasonable interpretation under the rule of Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). Therefore, he argues, the decision by the SCS is invalid. We disagree, and conclude that the regulations carefully follow the statutory language and are reasonable interpretations of any statutory ambiguities.

The first aspect of the regulations that Gunn challenges is their definition of a converted wetland. He contends that the definitions at 7 C.F.R. § 12.2(a)(6) & 12.32 (1992) are contrary to the statute. Section 12.2(a)(6) defines converted wetlands in terms virtually identical to those used in the statute.[3] Section 12.32(a) lists factors that

---

[3]16 U.S.C. § 3801(a)(6)(A) provides that:

The term "converted wetland" means wetland that has been drained, dredged, filled, leveled, or otherwise manipulated (including any activity that results in impairing or reducing the flow, circulation, or reach of water) for the purpose or to have the effect of making the production of an agricultural commodity possible if
>    (i) such production would not have been possible but for such action; and
>    (ii) before such action —
>        (I) such land was wetland; and
>        (II) such land was neither highly erodible land nor highly erodible cropland.

In comparison, 7 C.F.R. § 12.2(a)(6)(A) provides that:

are to be considered in determining whether a wetland has been converted, such as whether woody hydrophytic vegetation has been removed. Finally, Section 12.32(b), which accords with the exception provided by 16 U.S.C. § 3801(a)(6)(B), explains that a wetland shall not be considered converted just because natural conditions, such as drought, allow a farmer to cultivate certain land, so long as that farming does not "permanently alter or destroy natural wetland characteristics" — the farmed-wetlands exception. We perceive no inconsistency between the regulations and the statute they are intended to effectuate. Rather, they provide scientifically defined bases for determining whether the provisions of the statute have been violated. Such expert refinements are well within the purview of the SCS, and do not make its determination in Gunn's case invalid.

Next, Gunn challenges the regulations' definition of "commenced." The statute allows the farming of wetlands the conversion of which was commenced before December 23, 1985, without the farmer's losing benefits. The regulations allow a farmer to demonstrate that he has commenced the conversion in one of two ways: by

---

> Converted wetland means wetland that has been drained, dredged, filled, leveled, or otherwise manipulated (including any activity that results in impairing or reducing the flow, circulation, or reach of water) that makes possible the production of an agricultural commodity without further application of the manipulations described herein if (i) such production would not have been possible but for such action; and (ii), before such action such land was wetland and was neither highly erodible land nor highly erodible cropland.

> Gunn points to the phrase "without further application of the manipulations described herein," which is in the regulation but not in the statute. We do not see what of substance this phrase adds or changes. Under the statute, conversion occurs when wetland is "manipulated" with a certain effect. The regulation simply underscores that it is the initial manipulation, not some subsequent "applications" of it, that is to be considered for this purpose. This is a reasonable interpretation of the statute.

showing he has actually dredged, drained, filled, leveled, or otherwise manipulated the wetlands before the given date, 7 C.F.R. § 12.2(a)(6) & 12.5(b)(3)(i), or that he has contractually committed substantial funds to someone else who will perform these activities, § 12.5(b)(3)(ii). Gunn reads the substantial-funds requirement to have impermissibly narrowed the statutory term "commenced" from what Congress intended. Von Eye v. United States, 92 F.3d 681, 685 (8th Cir. 1996), which considered the application of the requirement, suggests it did not. Moreover, the substantial-funds provision allows a farmer to come within the exception not only by actually starting the land-moving activities, as the statutory term "commenced" naturally suggests, but also by simply committing to have such activities undertaken in the future. Gunn has not shown that the 1992 conversion was commenced under either the statutory definition or the definition in the regulations. Any discrepancy between the two, therefore, does not change the conclusion that his wetlands do not come within the exception for previously converted wetlands.

Alternatively, Gunn could succeed on his claim if he had actively pursued this particular conversion since before December 23, 1985. Downer v. United States, 97 F.3d 999, 1004 (8th Cir. 1996). The initial improvement took place in 1906, and the SCS told Gunn he could maintain that drainage system without losing benefits. (This accords with Von Eye, 92 F.3d at 685, which allows post-1985 conversions only to the extent of plans already in place in 1985.) In 1992 another conversion took place. Gunn has not demonstrated that the two constructions, over 80 years apart, were actually one actively pursued conversion. To the contrary, the 1906 work achieved what was intended, even though it later proved inadequate.

Gunn also argues — and this may be his principal point — that he is entitled to an exemption under the plain words of the statute. Section 3822(b)(1)(A) of Title 16 provides, in relevant part, that "[n]o person shall become ineligible . . . for program loans or payments . . . [a]s the result of the production of an agricultural commodity on . . . [a] converted wetland if the conversion of the wetland was commenced before

December 23, 1985." Gunn claims that his land fits this definition, because, in his view, it became a converted wetland in 1906, at the time of the initial improvements. He points to the definition of the term "converted wetland" in 16 U.S.C. § 3801(a)(6)(A). This provision reads, in pertinent part, as follows: " 'converted wetland' means wetland that has been drained . . . or otherwise manipulated . . . for the purpose or to have the effect of making the production of an agricultural commodity possible if . . . before such action . . . such land was wetland . . .." In 1906, Gunn says, his land was drained or otherwise manipulated both for the purpose and with the effect of making the production of agricultural commodities possible. This production, in fact, has continued ever since. Accordingly, the land became "converted wetland" before December 23, 1985, and remains in that classification forever, whatever may have happened later.

We agree with Gunn that the words of the statute, considered in isolation, can bear the meaning for which he contends. The agency's interpretation, however, is different, and we believe that the interpretation is sufficiently plausible to meet the Chevron test. The agency stresses the requirement that "converted wetland" is land that before drainage "was wetland." On this view, land is either wetland or converted wetland. If significant wetland characteristics remain, the land remains wetland and cannot be converted wetland. If the drainage or other manipulation has been sufficient to make crops producible, as is the case here, the land is best described as "farmed wetland," a term that does not appear in the statute but that the agency's regulations have adopted. "Farmed wetland" can continue to be farmed without the loss of benefits, but only so long as the previously accomplished drainage or manipulation is not significantly improved upon, so that wetland characteristics are further degraded in a significant way. In the present case, of course, the 1992 improvements have done exactly that. They were designed to and have in fact further degraded the wetland characteristics of the farm. It follows that part of the farm is "converted wetland," but that it did not become converted wetland until 1992.

This interpretation also accords with the general purpose of the statute — to preserve those wetland characteristics still in existence in 1985. Gunn's view, by contrast, would run counter to this purpose, at least to a significant extent. Under his approach, if any drainage has taken place before December 23, 1985, making it possible to produce agricultural commodities to any significant extent, the property becomes exempt altogether, no matter what further improvements might occur. As Gunn recognizes, under this approach, "it does not matter if the production [made possible by the earlier drainage] is merely 20% possible or 99% possible." Reply Brief for Appellant 12. The land, once any improvement whatever has occurred before 1985, becomes permanently exempt from the statute. We do not think that this interpretation furthers Congress's general purpose, nor do we think that it is the only one possible under the statutory language. We therefore defer to the interpretation of the Department of Agriculture. Gunn does not contest the fact that the land continued to have significant wetland characteristics before the 1992 work. Part of the purpose of Congress was to preserve these characteristics.

Next, Gunn argues that the conversion comes within the outside-agent exception to the anti-conversion rules. The regulations establish a presumption that conversions undertaken by a drainage district, in whose jurisdiction a farmer resides and which has assessed the farmer for part of the costs of the activity, are attributed to the farmer, unless he can show that the conversion was caused by an unassociated third person and that he is not using the land for agricultural production. See 7 C.F.R. § 12.5(b)(1)(iv)(D). Gunn contends that the drainage district's ditch-digging should not, as a matter of law, be attributed to him, and therefore that his land should not be deemed converted. But Gunn has not met the burden placed upon him by the regulations, and nothing in the statute exempts a farmer from the provisions of the Act simply because that land is converted by a drainage district.[4] We have found no

_____

[4]Gunn contends that the regulations are inconsistent with a subsequently enacted (1990) provision, 16 U.S.C. § 3824, which provides that croplands that have been

-9-

evidence in the record to support Gunn's argument that attribution to him of the district's activities was erroneous. In fact, Gunn joined with other landowners in the petition to have the improvements made. Jt. App. 108. Therefore, he can be held responsible for the conversion of wetlands that the improved drainage was found to have caused, and he is not entitled to the exemption in the regulation.[5]

B.

Gunn also argues that the SCS failed to follow its own regulations in determining that the acreage in question was "wetland." He cites 7 C.F.R. § 12.33(b). The portion of the regulation on which Gunn relies reads as follows:

> Maintenance or improvement of . . . converted wetlands for the production of agricultural commodities are not subject to this rule so long as such actions do not bring additional wetland into the production of an agricultural commodity. Additional wetland means any natural wetland

---

turned into wetland by "the actions of an unrelated person or public entity, outside the control of, and without the prior approval of, the landowner . . . shall not be considered to be wetland." That provision does not apply to Gunn's situation. Section 3824 allows a farmer whose cropland is turned into wetland to return that land to cropland without converting it within the meaning of the statute. We do not see how this statute is applicable to the case at hand, as Gunn does not contend that his land was turned into wetland by the drainage district. He contends the opposite: that his wetlands were turned into cropland. In addition, the drainage district is not "unrelated" to Gunn. His land is included within it, and he was one of the landowners who applied for the 1992 ditching.

[5]We have received a brief amicus curiae from the Iowa Drainage District Association in support of Gunn's position. We have considered it to the extent it supports arguments advanced by Gunn on appeal. We have no reason to consider the arguments it advances that were not raised by Gunn himself. Knetsch v. United States, 364 U.S. 361, 370 (1960).

or any converted wetland that has reverted to wetland as the result of abandonment of crop production.

We do not believe that the quoted language helps Gunn's case. His property, for reasons we have given earlier in this opinion, never became "converted wetland," because it retained continuously from 1906 until at least 1992 wetland characteristics. The property was thus properly classified as "farmed wetland," rather than "prior converted wetland." The quoted portion of the regulation comes into play only if "converted wetlands" are involved.

We add that the concluding sentence of the regulation appears to lend further support to the SCS position in this case. This sentence reads as follows, in pertinent part:

> Furthermore, the maintenance of any alteration or manipulation that affects the reach or flow of water made to a wetland that was cropped before December 23, 1985, would not cause a person to be determined to be ineligible under this part, provided that the maintenance does not exceed the scope and effect of the original alteration or manipulation, as determined by SCS . . ..

We think this language fits Gunn's situation. His property is wetland that was cropped before December 23, 1985. The work undertaken in 1992 definitely did exceed the scope and effect of the original manipulation. Accordingly, SCS acted consistently with its own regulations in determining that the 28.2 acres in question were wetlands, on which Gunn could not farm by mechanical means without losing his eligibility for federal farm benefits.

III.

Both parties now agree that the District Court was without jurisdiction to entertain Gunn's claim for just compensation under the Fifth Amendment, because Gunn requested damages in excess of $10,000.00. See 28 U.S.C. §§ 1491 & 1346(a)(2), the Little Tucker Act. Gunn argues on appeal, however, that the District Court should have transferred this claim to the United States Court of Federal Claims. Such a transfer is authorized by 28 U.S.C. § 1631 if the interests of justice warrant it and the court to which the case is transferred would have jurisdiction. Another statute, 28 U.S.C. § 1500, provides that the Court of Federal Claims has no jurisdiction over a claim for which, or in respect of which, a case is pending in another court. The Federal Circuit has interpreted this provision to bar the Court of Federal Claims' jurisdiction over a claim only when another claim based on the same operative facts and seeking the same type of relief is pending in a different court. See Loveladies Harbor, Inc. v. United States, 27 F.3d 1545, 1551 (Fed. Cir. 1994) (en banc). The two claims in Loveladies were a challenge to the government's denial of a wetlands-use permit under the Administrative Procedure Act and a takings claim based on that denial. The court held the two claims sought different types of relief. Id. at 1551-52. Gunn's two claims are similar. We think the Court of Federal Claims would have jurisdiction over the takings claim if it were transferred.

Gunn also must show that the interests of justice require transfer of his claim, a decision that lies within the discretion of the trial court. Section 1631 was enacted so that parties confused about which court has subject-matter jurisdiction would not lose an opportunity to present the merits of a claim by filing in the wrong court and then, upon dismissal, having the claim barred by a statute of limitations. Accordingly, we have in the past directed transfer when a plaintiff in good faith filed in the wrong court and the statute of limitations would have run before he could refile properly. See In re Apex Oil Co., 884 F.2d 343, 346 (8th Cir. 1989); Hempstead County & Nevada County Project v. United States E.P.A., 700 F.2d 459, 463 (8th Cir. 1983). Gunn has

-12-

not shown that either of those circumstances exists here. So far as we can tell from the record now before us, Gunn is free at any time to file his takings claim in a separate action before the Court of Federal Claims.

An additional word should be added to clarify the situation in the event of further proceedings on count II in the Court of Federal Claims. The District Court's opinion, slip op. 7, states that "Gunn has not shown that he is entitled to compensation under an inverse condemnation theory." This statement appears in the opinion after the Court had already held that it lacked jurisdiction of count II, which is the count containing the inverse-condemnation theory. We take this statement to be dictum. The District Court had no jurisdiction to pass on the merits of the inverse-condemnation theory, and if this theory, either in a separate action or otherwise, should later be asserted before the Court of Federal Claims, we do not believe the District Court's statement should be taken to preclude whatever rights Gunn may have. In that event, in other words, it would be up to the Court of Federal Claims to decide the merits of Gunn's inverse-condemnation theory.

On this understanding, the judgment of the District Court is

Affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.